THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM JACKSON, Defendant-Appellant.

First District (2nd Division)    No. 79-142

Opinion filed September 23, 1980.

462

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Richard F. Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, William Jackson, was charged by indictment with three counts of murder in violation of sections 9—1(a)(1), 9—1(a)(2), 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 9—1(a)(3)), and one count of arson in violation of section 20—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 20—1(a)). Following a jury trial defendant was found guilty of murder and was sentenced to the Illinois Department of Corrections for a term of not less than 40 years nor more than 120 years. Defendant appeals presenting the following issues for review: (1) whether defendant was proved guilty of murder beyond a reasonable doubt; (2) whether sufficient foundation was laid for the admission of expert testimony; (3) whether defendant was deprived of his right to a fair trial because he was not permitted to examine one witness, a Frank McMahan, as a court's witness; (4) whether the trial court erred when it refused to permit the jury foreman to ask a question; and (5) whether defendant's sentence should be reduced or the cause remanded for resentencing.

For reasons hereinafter set forth we affirm the judgment of the circuit court of Cook County.

Georgia Mae Lang (hereinafter referred to as the victim) resided with her daughter, Dorothy Lang Thompson, her son, Christopher Lang, and defendant in a first-floor apartment of a building located at 5260 West

Adams Street in Chicago, Illinois.[1] This building was owned by the victim and her brother, Charles Jordan, who resided in the apartment contiguous to the one occupied by the victim. Christine Jordan, the victim's sister, occupied the basement apartment directly beneath the victim's apartment.

On June 25, 1975, at approximately 1:30 a.m. the victim returned home from her employment. At approximately 2:30 a.m. defendant returned home and was admitted to the apartment by the victim, whereupon he followed the victim into her bedroom. A conversation between the victim and defendant ensued during which both Thompson and Lang heard "loud voices" and "cursing." Thompson heard the victim tell defendant not to "shove" her and to "go back to the streets where [his] women [were]." Both Thompson and Lang remained awake until approximately 5 a.m.

Thompson was awakened at approximately 8:45 a.m. by the ringing of the telephone. Defendant, who was fully dressed, brought the telephone, which had a long extension cord, to Thompson's bedroom. As Thompson talked on the telephone, she walked into the den and saw her mother, who was lying on the couch, look up at her. As Thompson was concluding her conversation, she saw defendant enter the apartment carrying a silver pipe-shaped object approximately eight to ten inches wide.[2] Thompson returned to her bedroom and fell asleep.

At approximately 9 a.m. Lang was awakened by the loud voices of his mother and defendant emanating from the den. Lang heard his mother tell defendant "to leave and to go back to the street with his lady." Defendant responded that "he would be glad to" so do. Lang fell asleep but was subsequently awakened by "something." He opened his bedroom door and observed that the "whole den was on fire." He jumped from his bedroom window, ran to the corner and "pulled the fire alarm" even though it appeared that "someone had already pulled the alarm." Lang returned to the back of the apartment building where he saw a neighbor, Frank McMahan, attempting to extinguish the fire with a garden hose.

Thompson was awakened by her mother's "loud agonizing scream." She opened her bedroom door, saw smoke and flames, and then jumped out of her bedroom window. From the outside she could see that the den, where she had last seen her mother, was on fire. Thompson saw her brother running towards the fire alarm. After the fire was extinguished, Thompson observed that most of defendant's clothes were missing from the living room closet in which defendant kept them.

---

[1] Defendant had resided with the victim and her family at this address for approximately two years prior to June 24, 1975. The record suggests that defendant had, on several occasions, moved from the victim's apartment for a day or two and then had returned. One of these "occasions" had arisen approximately one or two weeks prior to the victim's death.

[2] Thompson was asked "How big was [the object], to the best of your recollection? Could you indicate with your hand?" The court then noted for the record "[a]pproximately eight inches wide is what she is indicating."

At approximately 8 a.m. on the morning of the fire, as Christine Jordan carried her garbage to the alley, she observed defendant's white 1974 Cadillac parked, facing east, at the gate. Approximately 45 minutes later Jordan saw Frank McMahan in the back yard. McMahan had entered the back yard through the alley entrance and had observed a white Cadillac, which he had seen driven by defendant, parked at the gate. Jordan then invited McMahan into her apartment for coffee. Approximately 15 minutes later, while sitting with McMahan in her living room, Jordan heard a "quick-like scuffling" and a "thud-like noise" from the den of her sister's apartment located directly above her living room. McMahan also heard a "scuffle" and a "thud on the floor." Jordan started toward the back door and while at her kitchen door, which is located approximately five feet from the outside door, she heard a "boom, boom noise." McMahan who had remained seated on the couch from where he could not see Jordan who was in the kitchen also heard an explosion above him which sounded like "hoof." Jordan "backed back," called for McMahan to come quickly and observed black smoke coming into her kitchen through a hole where a radiator had been removed from the kitchen upstairs. McMahan responded as quickly as possible and also noticed dark smoke coming into Jordan's kitchen. As Jordan stood at her kitchen door, she heard footsteps descending the stairs from the first floor. She then saw defendant. As she ascended the steps from her apartment to ground level, she saw defendant run through the yard to the alley and run in an easterly direction in the alley. Defendant was holding a bright can by its handle. Jordan lost sight of defendant for a few seconds because her view was blocked by a garage and trees. Defendant then turned around, ran in a westerly direction (back towards his automobile), got into his automobile and drove away. When McMahan reached Jordan's kitchen door, Jordan was already outside on ground level. As McMahan ascended the steps from Jordan's apartment to ground level, he observed defendant's car in the alley. As McMahan was uncoiling a garden hose, he saw someone get into the white Cadillac and drive away.

Jordan ran up the stairs to the victim's apartment, calling her sister's name but receiving no response. She then ran to the corner and pulled the fire alarm while McMahan attempted to extinguish the blaze with a garden hose.

On June 25, 1975, at approximately 10 a.m. Russell Haley, a Chicago firefighter, responded to a report of a fire at the victim's apartment building. Upon his arrival Haley entered the victim's apartment through the kitchen. Five to eight other firefighters had begun to extinguish the fire. Haley assisted another fireman who had discovered the victim's body in the den. Haley pulled the body into the kitchen.

Officer Dennis Semple of the Chicago Police Department received a

radio communication directing him to the victim's building where a fire was in progress. Upon his arrival at 10:15 a.m. he observed a first floor apartment burning and was assigned to "direct traffic and crowd control."

Sergeant James Nemec, an evidence technician for the Chicago Police Department, and his partner, Thomas Ginnelly, spoke with fire personnel regarding the origin of the fire, took photographs, and searched the kitchen and den for possible evidence of arson. Nemec and his partner collected samples of debris from the den, including burned fragments of the couch and floor.

John Bailey, an investigator for the Chicago Fire Department assigned to the Chicago Police Department Bomb and Arson Unit, and his partner, Lieutenant William Kennehar, arrived at the scene of the fire at approximately 10:35 a.m. Bailey entered the kitchen and photographed the body lying on the floor. He examined the extent of burning in the den, and determined the origin of the fire to be at floor level in front of the couch. When Bailey entered the den, he smelled the odor of gasoline. He had also smelled gasoline in the kitchen while the body was lying on the kitchen floor. Bailey testified that the cause of the fire was the ignition of gasoline vapors which produced a "flash type fire" or an "instant explosion type fire" which was accompanied by a "whoosh" type explosion or a "boom" sound. He also noted that the building had not been "set up" by an arsonist.

After speaking with Christine Jordan, Bailey went to the alley behind the building, proceeded eastward for approximately 60 feet and discovered a gasoline can in a yard.

Dr. Pascual Culala, a medical doctor trained as a forensic pathologist, performed the autopsy upon the body of the victim. The external examination revealed extensive burns over the entire body, and a "very strong" odor of gasoline emanating from the "upper trunk, face and head region of the body." No marks of trauma or violence were apparent on the body other than those related to the extensive burns. The cause of death was extensive burns. A blood sample taken from the victim and analyzed by a toxicologist revealed a 51% saturation of carbon monoxide but did not reveal the presence of alcohol, barbiturates, tranquilizers or narcotics. Dr. Culala determined that the victim had gone into shock before she died, and that such shock could have been caused by dousing the victim with gasoline and then igniting the gasoline.

Officer William Tyrrell, a chemist for the criminalistics division of the Chicago Police Department, analyzed the samples of debris and the contents of the gasoline can, both of which had the odor of gasoline. His analysis indicated that the contents of the gasoline can contained a mixture of hydrocarbons commonly found in gasoline and that the debris contained some of the components commonly found in gasoline.

John Olejniczak, a patrolman technician for the Chicago Police

Department, made a comparison of defendant's fingerprints with the fingerprints taken from the gasoline can. The prints taken from the gasoline can were not identical to the prints of defendant. Nor were they identical to the prints of several police and fire personnel. However, no prints for comparison were taken from the handle of the can.

A warrant for defendant's arrest was issued on June 26, 1975. On July 28, 1975, at approximately 3:20 a.m. Edward Zell, an Ohio State highway patrolman assigned to patrol U.S. Route 23 in Marion County, Ohio, was checking the registration numbers on vehicles parked in a southbound rest area and noticed that there was a person lying in the back seat of a 1974 white Cadillac. When the additional officers whom Zell had summoned arrived on the scene, defendant was arrested.

Stephanie Frias, a personnel assistant who maintains payroll and attendance records for Western Cullen, testified that defendant was hired by Western Cullen in 1971 and was terminated on June 30, 1975. Defendant's time card for the week ending June 28, 1975, indicated that defendant worked on June 23 and 24 but was thereafter terminated for his failure to report to work for three consecutive days. On June 27, 1975, defendant failed to claim a paycheck in the amount of $150.62 to which he was entitled, and on September 30, 1975, requested by letter that the check be sent to him. Although defendant was entitled to two weeks vacation, such vacation was scheduled for July, during a "plant shutdown."

## I.

Defendant first contends that he was not proved guilty of murder beyond a reasonable doubt. In support of his contention, defendant argues that the testimony of Christine Jordan, the sole witness alleged to have observed defendant exit the victim's burning apartment with a gas can, was "thoroughly discredited." Defendant further argues that the other evidence adduced at trial was "wholly circumstantial" and therefore insufficient to establish his guilt. The State maintains that defendant was proved guilty beyond a reasonable doubt by both direct and circumstantial evidence. The State further maintains that testimony of Christine Jordan was credible, consistent and convincing.

■■ The weight and credibility to be afforded a witness' testimony is a determination for the jury as the trier of fact, and unless that determination is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt, the verdict will not be disturbed on appeal. (*People v. Donald* (1963), 29 Ill. 2d 283, 287, 194 N.E.2d 227.) Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801.) It is not necessary that the jury disregard the inferences which naturally flow from the evidence, nor is the trier of fact required to search out a series of

potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. (*People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382.) Rather, a trier of fact may use common sense and general knowledge in considering evidence and drawing the proper inference from it. (*People v. Toliver* (1978), 60 Ill. App. 3d 650, 652, 377 N.E.2d 207.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt. *Williams*, at 485.

■■ Defendant points to certain discrepancies in Christine Jordan's testimony as indicative of its untrustworthiness. These alleged discrepancies concern the exact location where Jordan was standing when she first saw defendant fleeing from decedent's apartment. On direct examination, redirect examination and cross-examination Jordan repeated eight times that she was standing at the door of her basement apartment when she first saw defendant. On one occasion during cross-examination she responded affirmatively when defense counsel inquired, "[t]hat's the first time you saw Mr. Jackson, when you were on ground level." However, of the nine times Jordan was questioned concerning her exact location when she first saw defendant, this was the only instance in which she did not respond that she was standing at her apartment door. These alleged discrepancies were before the jury and were properly a matter for their consideration. (*People v. Kriston* (1973), 12 Ill. App. 3d 18, 22, 297 N.E.2d 206.) Minor discrepancies and inconsistencies in testimony do not render that testimony unworthy of belief, or destroy the credibility of that witness, but go only to the weight to be given that testimony. (*People v. Hanna* (1969), 42 Ill. 2d 323, 329, 247 N.E.2d 610.) In the instant case these alleged discrepancies are not of such a nature as to render the testimony of Jordan so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. The witness' apparent disorientation on the one occasion is easily explained by the confusing nature of the questioning by defense counsel. A complete and objective reading of the proceeding reveals that her testimony was substantially unchanged.

■■ Defendant also argues that Jordan's testimony is incredible because there were contradictions between her testimony and Investigator Bailey's recollection as refreshed by his investigative report. Investigator Bailey's report indicated that Jordan had told him she had seen defendant pour a fluid on the kitchen floor as he exited decedent's apartment. Jordan adamantly denied making such a statement and her denial is consistent with her testimony that she did not see defendant until he was outside decedent's apartment. In *People v. Watkins* (1976), 44 Ill. App. 3d 73, 357 N.E.2d 1376, a police officer testified from his report that the victim of an armed robbery had told him that she had once worked with defendant. At trial the

victim denied that she had made such a statement. The appellate court held:

> "The fact that there were contradictions between her testimony and the officer's recollection from the police report also does not render her testimony incredible. From our review of the whole record, keeping in mind the abbreviated forms used by the police when making their reports, we cannot say that the jury was precluded from inferring that the report evidenced a misunderstanding of the statement of the complaining witness." (44 Ill. App. 3d 73, 76-77.)

Again, this contradiction was before the jury and properly a matter for their consideration. It is not of such a nature so as to render Jordan's testimony so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt.

■■ Defendant has also placed considerable emphasis on Jordan's testimony which demonstrates that she did not report certain details to investigating police officers and firemen immediately after the incident. Defendant argues that Jordan did not inform Investigator Bailey that the gasoline can which defendant carried was bright or red. We note that Bailey found the gasoline can only moments after talking with Jordan. Defendant also argues that Jordan only told Investigator Bailey that defendant had run to the alley, turned east and "was gone," but failed to mention that defendant returned to his car and drove away. We note that the fact that defendant fled from the scene in his automobile is corroborated by defense witness Frank McMahan, who testified that he saw someone get into the white Cadillac and drive away. Jordan's alleged failure to report these details to investigating police officers and firemen immediately after the incident is easily explained by the fact that she had just undergone an obviously traumatic experience, and by the fact that the investigators did not question Jordan in as great detail as did defense counsel. The failure to report these details certainly does not render her testimony unreasonable or improbable.

Defendant also argues that Jordan's testimony was contradicted by McMahan's because McMahan only saw a person "getting into the white Cadillac" but did not see the defendant run across the yard. The State responds that McMahan's testimony is consistent with and corroborative of Jordan's. McMahan testified that by the time he reached the back door of the kitchen, Jordan was already on the ground level. Jordan testified that she first saw defendant begin to cross the yard while standing at her back door, and as she ran up the stairs to ground level defendant continued to cross the yard to the alley. Jordan was on the ground level when defendant reached the alley. Thus, it is not improbable or unreasonable that by the time McMahan ran up the stairs, he was only able to see a person as "they were getting into the white Cadillac."

Defendant also complains that Jordan and Christopher Lang had an apparent bias against defendant. When asked how defendant and her brother "got along," Dorothy Lang Thompson answered "not too good." Christine Jordan admitted that she "did not get along very well" with defendant but specifically denied that she was his enemy and that she had "pulled a gun" on him. Both Christopher Lang and Dorothy Thompson testified that they had never seen Jordan and defendant fight. There is no indication in the record that Jordan and Lang did not testify with complete impartiality and truthfulness. Moreover, the jury had ample opportunity to observe each witness and evaluate their credibility.

Defendant also argues that "there is no evidence linking him to the gas can" in light of the incredible nature of Jordan's testimony and the lack of his fingerprints on it. We have already determined that Jordan's testimony was both credible and consistent. Jordan identified the gasoline can as identical to the one defendant carried. Investigator Bailey recovered the can in a yard 60 feet east of the victim's apartment building. The jury was entitled to infer that the can recovered by Bailey was the same can defendant was carrying when Jordan saw him run east in the alley. The lack of defendant's fingerprints on the gasoline can was explained by Jordan's testimony that defendant carried the can by its handle, and by Officer Olejniczak's testimony that he did not test for fingerprints on the handle. Additionally, chemical analysis revealed that the contents of the gasoline can contained all the major components normally identified in gasoline under the test employed, and that the debris from the fire contained 30 of the 45 major components commonly found in gasoline. From these facts the jury properly could have inferred that the contents of the can were used to murder the victim.

Based upon all of the foregoing, we cannot conclude that the testimony was so replete with contradictions and inconsistencies that defendant's guilt was not established beyond a reasonable doubt.

## II.

Defendant next contends that insufficient foundation was laid for the admission of expert testimony.

### A.

In support of his contention defendant first argues that the pathologist's testimony regarding the examination of the victim's body should not have been admitted into evidence because "[t]here was no evidence connecting the body which was photographed at the morgue, and on which the autopsy was performed, to the body found in the fire, nor did any witness identify the body at the morgue as the body of Georgia Mae Lang, whom Jackson was charged with killing."

The State contends that defendant waived any potential error by failing to properly preserve the issue for appeal. Defendant never interposed any objection to the pathologist's testimony on the ground that the autopsy had been performed on a body that was not the body of Georgia Mae Lang. Moreover, defendant did not raise this issue in his written motion for a new trial.

The failure to present proper and timely objection at trial generally constitutes a waiver of error, if any. (*People v. Adams* (1968), 41 Ill. 2d 98, 101, 242 N.E.2d 167.) This rule has been held applicable on review to claims of error concerning the competency of evidence. (See, *e.g., People v. Williams* (1963), 28 Ill. 2d 114, 116, 190 N.E.2d 809; *People v. Trefonas* (1956), 9 Ill. 2d 92, 98-99, 136 N.E.2d 817.) Moreover, the general rule followed by this court is that the failure by defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) However, Supreme Court Rule 615(a) (Ill. Rev. Stat. 1973, ch. 110A, par. 615(a)) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." This rule does not mandate that a reviewing court consider all errors involving substantial rights whether or not the same have been brought to the attention of the trial court. Rather, the rule is a means of meliorating the harshness of the strict application of the general waiver rule. *Pickett.*

> "The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented." (*People v. Burson* (1957), 11 Ill. 2d 360, 370, 143 N.E.2d 239.)

Likewise, in criminal cases in which the evidence is closely balanced, the supreme court has held that a court may consider errors that have not been properly preserved for review. *People v. Bradley* (1964), 30 Ill. 2d 597, 601, 198 N.E.2d 809.

■■ We do not consider that defendant in the case at bar was deprived of a fair and impartial trial. We also do not consider that the evidence is closely balanced. Thus, we find no reason for departing from the general rule that issues not properly preserved for review are waived. Christine Jordan, the pathologist and Investigator Bailey each identified separate photographs depicting the body of the victim.[3] Moreover, Christopher Lang watched as fire department personnel removed his mother's body from the den and

---

[3] At oral argument and in a subsequent motion defendant represented to this court that he would provide the photographs of the victim entered into evidence. The records of the appellate court clerk do not indicate that the photographs in question were received.

placed it in the kitchen. Christine Jordan also saw her sister's body lying in the kitchen after fire department personnel had removed it from the den. Consequently, the body found in the den of the victim's apartment was identified by the victim's children and sister as being that of the victim.

It would seem logical that if defendant's counsel believed that the autopsy had been performed on a body that was not the body of Georgia Mae Lang, he would have objected at trial to the pathologist's testimony and would have raised the point in his motion for a new trial. In fact, defendant's attorney made several comments during trial which leave no doubt that he had no objection to the identity of the body upon which the pathologist performed the autopsy. In the course of arguing against the admission into evidence of a number of photographs, including the photograph identified by the pathologist, Christine Jordan and Investigator Bailey, defense counsel made the following comments:

> "Extremely prejudicial to the jury to view such photos when there's no purpose for them. Extensive medical testimony as to the injuries of the deceased. Deceased had been identified. We stipulated to the identity without the photographs. Did not become necessary to identify the photographs as the deceased.
>
> * * *
>
> The purpose in a picture like this is to show, if it can, identity. There was indications as to identity of the deceased. We'll stipulate the lady died was in fact Miss Lang."

Thus we conclude that the admission of the pathologist's testimony regarding the examination of the victim's body was not plain error which would warrant our departure from the general rule that issues not properly preserved for review are waived.

### B.

Defendant also argues that evidence pertaining to analysis of the debris collected from the victim's apartment should not have been admitted because there was no proof that the debris was not tampered with between the time the fire was extinguished and the collection of the samples of debris. Defendant does not allege any deficiency in the chain of custody of the debris after the samples were collected, but rather alleges that there is no evidence that the debris was not tampered with prior to its collection from the floor of the den. The State maintains that there was absolutely no suggestion that the debris was tampered with in any manner during the two hours immediately after the fire, and that the uninterrupted presence of police and fire investigators in and around the victim's apartment provides ample assurance that the samples of debris were not tampered with prior to their collection by a police officer evidence technician.

The record reflects that from the time that the first fire fighters began

extinguishing the fire until the evidence technician arrived, there was a continuous presence of fire, police and investigative personnel in and around the victim's apartment. Chicago police officer Semple arrived at the victim's apartment at approximately 10:15 a.m.[4] and "proceeded to handle crowd control and traffic control." At that time fire fighters were in the process of extinguishing the fire. After speaking with fire personnel, Semple summoned arson investigators, evidence technicians and crime laboratory personnel to the scene. He continued traffic and crowd control as investigators began to arrive. When the fire was extinguished, Semple entered the apartment and inspected the kitchen and the den. As soon as he entered the premises he smelled the odor of gasoline. At approximately 10:35 a.m., while Semple was still inspecting the premises, Investigator Bailey of the Chicago Fire Department arrived. At that time Bailey noted that there was a police officer standing on Lockwood at the side entrance to the apartment. Upon entering the victim's apartment, Bailey smelled the odor of gasoline.

At trial Bailey testified that there were probably more police officers at the scene but that he could not recall. We note that Bailey did not testify that there were no police officers guarding the premises, but rather that he did not recall whether any officers had been so assigned. Bailey did recall, however, that there were firemen entering and exiting the apartment, in the yard and on the sidewalk. Additionally, Bailey explained that: "No unauthorized persons are allowed on a specific fire scene, on this particular type of fire scene, an arson fire."

When Chicago police department sergeant Nemec, the evidence technician, arrived at the scene at approximately 12:20 p.m. to collect samples of the debris, he spoke with fire personnel regarding the origin of the fire. Officer Semple was still present at the apartment.

■■■ The rule that an object must be in substantially the same condition when offered into evidence as it was when the crime was committed does not require the prosecution to exclude all possibility that the article may have been tampered with; rather the court must be satisfied that in reasonable probability the article has not been changed in any important aspect. (*People v. Wrona* (1972), 7 Ill. App. 3d 1, 5, 286 N.E.2d 370.) In the absence of any indication or suggestion of substitution, alteration or other form of tampering, we are of the opinion that the protective measures employed were sufficient to render admissible the evidence pertaining to the analysis of the debris. The fact that more stringent protective techniques were not employed goes to the weight or the credibility of the evidence in contrast to its admissibility.

Defendant directs our attention to *People v. Brown* (1972), 3 Ill. App. 3d 879, 279 N.E.2d 382, and *People v. DeStefano* (1975), 30 Ill. App. 3d 935,

---

[4] The record reflects that the fire alarm was received at approximately 10 a.m.

332 N.E.2d 626. These cases are distinguishable from the case at bar. In *Brown* defendant's conviction for transporting an open bottle of intoxicating liquor was reversed because the arresting officer never inventoried the bottle and there was no writing on the bottle to identify it as the one taken from defendant's automobile. Nor was the bottle sealed to eliminate the possibility of tampering or substitution. Moreover, there was no testimony that the arresting officer had sole access to the locker in which the whiskey bottle was stored for the four months between defendant's arrest and trial. In *DeStefano* defendant's conviction for murder was reversed because expert testimony was given, over defendant's objection, comparing paint chips found on the victim's clothes in 1963 with paint samples recovered from the floor of the bomb shelter in 1972. No evidence was introduced by the State showing that the floor of the shelter remained in the same condition from 1963 to 1972. In fact several defense witnesses gave uncontradicted testimony that the floor of the bomb shelter had been flooded with water and not painted at all until 1967. The general contractor who remodeled the shelter in September 1966 testified that he noticed a great deal of water in the shelter, and that the floor was not painted.

In the case at bar approximately two hours elapsed before the samples of debris were collected. Unlike *DeStefano* there is no uncontradicted testimony by defense witnesses indicating that the condition was not substantially the same. There is only pure speculation. Accordingly, we conclude that the crime laboratory chemist's testimony regarding analysis of the debris was properly admitted into evidence.

## C.

Defendant contends that a sufficient foundation was not established for the admission of the testimony of the crime laboratory chemist concerning the contents of the gasoline can and analysis of the debris. In support of his contention defendant argues that the gasoline can was not shown to be linked to him, and that the contents of the can were not shown to be linked to the fire and the samples of debris. The State maintains that the expert testimony of the crime laboratory chemist was properly admitted because there was ample evidence adduced at trial which establishes that the gasoline can recovered near the scene was the same can defendant was carrying when he fled from the victim's burning apartment, and that the contents of that can were used to start the fire in which the victim was killed.

■■ A physical item may not be admitted into evidence unless it is connected to both the defendant and the crime. (*People v. Jones* (1961), 22 Ill. 2d 592, 599, 177 N.E.2d 112.) Proof of such connection may be circumstantial. (*People v. Panczko* (1943), 381 Ill. 625, 633-34, 46 N.E.2d 28.) Additionally, there is no necessity to demonstrate that an object admitted into

evidence was actually used, but only that the object was suitable for the commission of the crime. (*People v. Miller* (1968), 40 Ill. 2d 154, 159, 238 N.E.2d 407, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401.) The mere fact that an item of physical evidence was not found in defendant's possession affects only the weight of the evidence, not the admissibility. *Cf. People v. Bryan* (1963), 27 Ill. 2d 191, 188 N.E.2d 692; *People v. French* (1978), 59 Ill. App. 3d 353, 357, 375 N.E.2d 502.

In the case at bar Christine Jordan testified that she saw defendant carrying a gasoline can as he fled from the victim's burning apartment. Approximately one hour later, an investigator discovered a gasoline can in the area toward which Jordan had seen defendant run. Jordan identified the can discovered by the investigator as looking "just like" the can which defendant was carrying. Moreover, the gasoline can was "new looking" and lacked the corrosion which would have accumulated on the can had it been lying in the yard for any length of time.

■■ The gasoline can was also linked to the fire and the murder of the victim. The contents of the can had a strong odor of gasoline and were subsequently found to contain all the components which are commonly identified upon chemical analysis of gasoline. The victim's kitchen and den as well as the victim's body emitted a strong odor of gasoline. The fire was shown to have been caused by the ignition of gasoline vapors and to have originated in the den on the floor in front of the couch. The cause of the victim's death was shown to have been extensive burns. The samples of debris collected from the area around the couch where the fire originated and where the victim's body was found, emitted an odor of gasoline. Chemical analysis of the samples proved that the debris contained 30 of the 45 major components found in gasoline. Accordingly, it is concluded that the above direct and circumstantial evidence connect the gasoline can and its contents to both the defendant and the crime as well as to the samples of the debris. Thus in our opinion the testimony of the crime laboratory chemist was properly admitted into evidence.

III.

Defendant contends that he was denied a fair trial because he was not permitted to examine Frank McMahan as a court's witness. The State maintains that defendant was not entitled to examine McMahan as a court's witness or as a hostile witness because there was no evidence that McMahan was hostile or unwilling to testify or that his testimony was surprising or untruthful. The State further argues that the examination of McMahan as a hostile or as a court's witness was not necessary to avoid a manifest injustice and that such examination would not have evoked any testimony that had not already been elicited during defendant's direct examination of McMahan.

■■ At the outset we note that at trial defendant sought to examine McMahan as a hostile witness. However, in his brief defendant only argues that he should have been permitted to examine McMahan as a court's witness. The terms hostile witness and court's witness have different meanings and being called as a witness under either designation is dependent upon different prerequisites and results in different types of privileges with respect to the type of interrogation permitted. Our discussion will be limited to whether defendant should have been permitted to examine McMahan as a court's witness.

Prior to calling Frank McMahan as a witness, defense counsel advised the trial judge that he did not wish to vouch for McMahan's credibility, but instead wished McMahan to be considered a hostile witness. During arguments by counsel, it was noted that defense counsel had interviewed McMahan earlier that day for approximately one hour, and had been provided with a summary of a statement which McMahan had previously given to the prosecution. Defense counsel also argued that McMahan was intoxicated at the time of the interview. The prosecutors argued that they saw no evidence of drinking. The trial court then stated that it understood why defense counsel might not wish to vouch for McMahan's testimony, and that it would not permit defendant to be precluded from calling such an important witness because he did not wish to vouch for McMahan's testimony. The trial court continued:

> "And I'm saying it on the record that I'll lean in your direction if by any answer that this witness gives indicates at all any kind of hostility or surprise I'll immediately call you to the side and inform you that he now becomes a court's witness and you can go on with your cross-examination or your leading questions of that witness."

During the course of direct examination defense counsel claimed McMahan had become hostile. The trial court stated that it found McMahan's testimony to be "truthful" and "straightforward." During cross-examination McMahan testified that he saw somebody get into a white Cadillac while he was uncoiling the garden hose. Outside the presence of the jury, defense counsel claimed that this testimony contradicted McMahan's testimony on direct examination that he had seen the car before he had picked up the hose. The trial court again advised defense counsel that McMahan's testimony was straightforward and truthful, and reminded defense counsel that he could rehabilitate McMahan during redirect examination if he found any distortion between McMahan's testimony on direct examination and cross-examination. Defense counsel did not, however, conduct any redirect examination.

A witness may be made a court's witness, and subjected to cross-examination by either side, where, for sufficient reasons shown, his integrity or veracity is doubtful and neither side desires to vouch for his testi-

mony. (*People v. McKee* (1968), 39 Ill. 2d 265, 270, 235 N.E.2d 625.) Calling a person as a court's witness rests in the sound discretion of the trial judge. (*People v. Mostafa* (1971), 5 Ill. App. 3d 158, 165, 274 N.E.2d 846.) The party requesting that a witness be called by the court must make a showing that manifest injustice would result if the request were refused. (*People v. Johnson* (1929), 333 Ill. 469, 473, 165 N.E. 235.) The practice of calling a person as a court's witness should be sparingly used. (*People v. Moriarity* (1966), 33 Ill. 2d 606, 615, 213 N.E.2d 516.) Thus, a proper foundation must be laid for the calling of a court's witness.

Although given the opportunity to so do, defendant failed to show that McMahan should have been considered a court's witness. Defendant did not establish any reason why the veracity of McMahan was doubtful, nor did he demonstrate that examination of McMahan as a court's witness was necessary to avoid a manifest injustice. On the contrary, the trial court concluded, during both direct and cross-examination of McMahan, that he was a truthful and straightforward witness. There is no evidence that McMahan was biased toward either party because of his acquaintance with the victim's brother and sister. Nor does there appear to be a contradiction between McMahan's testimony on direct examination and cross-examination.

McMahan testified during cross-examination that, after ascending the stairs from Jordan's apartment, he walked nine feet east to where the garden hose was located, and that it was while he was uncoiling the hose that he saw someone get into the Cadillac parked in the alley. On direct examination McMahan did not testify that it was while he was ascending the steps from Jordan's apartment that he observed someone entering the Cadillac. Rather, McMahan testified that, as he was ascending the five steps to ground level, he saw defendant's car, but did not know if defendant was in the car. Defendant's car was not moving at that time. When specifically asked if he saw defendant "at that time," McMahan, in an attempt to correct defense counsel's erroneous assumption, responded, "I can't say I saw him at all. I saw someone get in the car." An objective reading of this portion of McMahan's testimony confirms that McMahan made this statement, not to establish the exact moment when he saw the person get into the Cadillac, but rather to correct defense counsel's assumption that McMahan had been able to positively identify defendant as the person he saw enter the Cadillac. Thus, we cannot conclude that the trial court abused its discretion when it refused to permit McMahan to be called as a court's witness.

## IV.

Defendant contends that plain error occurred because the trial court refused to clarify a point of law at the request of the jurors. The State

maintains that defendant has waived this issue by failing to object at the time of the request and by failing to raise this issue in his written motion for a new trial. In addition, the State argues that the court could not have allowed the foreman to ask his question under the circumstances because such a response would have constituted an improper communication with an individual juror. The State further argues that the jurors were provided with an opportunity to clarify any points of law and that any delay in providing the jurors with such opportunity did not contribute to or affect the jury's verdict.

The jury commenced deliberations at 1 p.m. At 8:35 p.m. the trial court asked the foreman whether the jury could reach a verdict. The foreman responded that the jury could reach a verdict but that at least two hours of further deliberation would be needed. At 11:40 p.m. the jury sent a note to the trial court indicating that a majority of jurors were of the opinion that they could not reach a decision. When the jury was brought into the courtroom the foreman informed the trial court that "[w]e as a group do not feel in a position to reach a verdict at this time, at this moment." The 11 other jurors were polled by the court and nine responded that a verdict could be reached if they were permitted more time to deliberate. At that the following colloquy ensued:

> "THE COURT: Well, it's now midnight. And suppose we provide housing for the jurors for this evening and we'll have them report back to the courtroom tomorrow morning at 9:30 for further deliberation.
>
> THE FOREMAN: Your Honor, may I ask one question? Or shall I do it through—
>
> THE COURT: You mean with reference to—
>
> THE FOREMAN: A point of law.
>
> (Whereupon the jurors were sequestered.)"

On the following morning at approximately 9:30 a.m. the trial court made the following statement to the prosecutors and defense counsel outside the presence of the jury:

> "Also I would like to say that last night as the jury was instructed to go back into the jury room and that they were going to be sent out for housing, the foreman gave the Court a question, or attempted to ask the Court a question on his own, saying that he had a question for the Court, and the Court did not allow him to state the question because if [sic] felt that the question was not coming collectively from the jury but was coming as an afterthought after this Court had polled each juror. When he made the request, if I had allowed him to ask his question, I then may have gotten a question from each member of the jury."

At 11:15 a.m. the trial court informed the jury that:

"My purpose in talking to you this morning is to inform you that last evening when we recessed and you left the building, or at the time when you were leaving, the foreman asked a question of the Court as to whether or not he could inquire of me on a point of law, and I did not orally respond to his question except to indicate by shaking my head 'no.' I would like to inform all of you as jurors that if the jury has a question concerning a point of law, and if the jury puts it in writing and makes a written request of the Court, the Court will take into consideration that question."

The jury resumed deliberations, and at 1 p.m. the foreman announced that the jury had found defendant guilty of murder.

Where a jury has raised an explicit question on a point of law arising from the facts over which there is doubt or confusion, the court should attempt to clarify the question in the minds of the jury members. (*People v. Land* (1975), 34 Ill. App. 3d 548, 550, 340 N.E.2d 44; *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 1035, 288 N.E.2d 622; *People v. Harmon* (1968), 104 Ill. App. 2d 294, 301, 244 N.E.2d 358, citing 23A C.J.S. *Criminal Law* §1376, at 1000 (1961).) The interests of justice require that a reviewing court consider a trial court's refusal to clarify such doubt or confusion despite the absence of objection. *Land,* at 550.

In the case at bar the instructions were not incomplete as in *Harmon*, and, in fact, there is doubt as to whether the jury ever actually requested a clarification. As shown, the foreman never stated any specific question. In effect, far from a specific request for clarification, the general statement regarding "a point of law" seems to have been withdrawn by the foreman. In so observing we note that the request was made as the jurors were recessing for the night and that the foreman himself indicated that he was willing to delay asking his question. The foreman inquired: "May I ask one question? Or shall I do it through—." The latter part of his request indicates not only a willingness to delay asking his question but also a willingness to ask the question in a different manner, such as through written notes to the trial court.[6] In addition, while the jurors were being polled, neither the foreman nor any other juror indicated that they desired clarification of a point of law. We also note that if the jury did in fact have an actual question regarding a point of law, the trial court provided the jury with ample opportunity to make their inquiry the following morning. Thus it is concluded that there is no indication that the jury arrived at a hasty or erroneous verdict because of their inability to obtain clarification of a point of law.

Our conclusion that reversible error did not result in the case at bar is well supported by *People v. Sanders* (1976), 37 Ill. App. 3d 236, 345 N.E.2d

---

[6] The record reflects that the foreman was aware that the jury could communicate with the trial court through written notes and had done so on two unrelated matters.

757. In *Sanders* immediately after the trial judge announced to the jurors that they would be sequestered overnight and that deliberations would resume the next morning, the jury foreman inquired, "Can we do any conferring with you at all or ask any questions of you?" The court responded, "No, you have all the evidence." The foreman then said, "It's the interpretation of one of the instructions," to which the court again responded that the jury had all the law and evidence. At that point the foreman stated that 45 minutes of further deliberation would probably be sufficient, so the jury did resume deliberations and a verdict was reached. The appellate court held that the trial judge "acted properly" in connection with the jury's deliberations and noted:

> "In the case before us the instructions were not incomplete and, in fact, there is extreme doubt as to whether the jury ever actually requested a clarification. As shown, the foreman never stated any specific question but told the judge, 'It's the interpretation of one of the instructions.' When the judge responded that the jury had all of the instructions, the foreman virtually interrupted the judge and stated that 45 minutes or perhaps less might be enough for the jury to reach a verdict. In effect, far from a specific request for clarification, the general statement regarding interpretation was withdrawn by the foreman." *Sanders*, at 243.

### V.

Defendant contends that the cause should be remanded for a new sentencing hearing before a different judge. In support of his contention defendant argues that his sentence was imposed as a punishment for invoking his right to a jury trial. Defendant further argues that the trial court's examination of a defense witness was not impartial. The State maintains that there is no evidence that the sentence imposed was in any way affected by the defendant's exercise of his right to a jury trial, and further maintains that the trial judge was impartial in questioning defendant's witness. The State further argues that defendant's sentence is consistent with purpose of the law, the nature of the offense and defendant's potential for rehabilitation.

### A.

At the outset we note that many of the cases relied upon by the State and much of argument presented by the State in its brief concern the circumstances under which a reviewing court may, pursuant to Supreme Court Rule 615 (Ill. Rev. Stat. 1979, ch. 110A, par. 615), reduce the sentence imposed by the trial court. In his reply brief defendant responds that he has made no argument requesting that this court reduce his sentence. We note that although defendant has not expressly requested that

this court reduce his sentence, his reliance upon *People v. Dennis* (1975), 28 Ill. App. 3d 74, 328 N.E.2d 135, a case in which the reviewing court did reduce the sentence imposed by the trial court, suggests that this court consider the question of whether defendant's sentence should be reduced. Moreover, as our following discussion will reflect, we are impelled to consider this argument.

During the selection of jurors defendant rejected the State's offer to recommend a sentence of not less than 15 nor more than 25 years if defendant pleaded guilty to murder. Following a trial by jury, defendant was found guilty of murder and was sentenced by the trial judge to the Illinois Department of Corrections for a term of not less than 40 nor more than 120 years.

■■ A defendant in a criminal case should not be punished by a heavy sentence merely because he exercises his constitutional right to be tried before an impartial judge or a jury. (*People v. Moriarty* (1962), 25 Ill. 2d 565, 567, 185 N.E.2d 688; *Dennis*, at 77.) This court has not hesitated to reduce the sentence where the record indicates that this principle has been violated. (*Dennis*, at 77; *People v. Smith* (1971), 132 Ill. App. 2d 1028, 1030, 271 N.E.2d 61.)[7] Although an allegation that the sentence was imposed as punishment for demanding a trial may be shown inferentially as well as through overt comments of the trial court (*Dennis*, at 77), the mere fact that a defendant may be given a greater sentence than that discussed at a pretrial conference does not support the inference that the heavier sentence was imposed as a punishment for demanding a trial. *People v. Busch* (1973), 15 Ill. App. 3d 905, 907, 305 N.E.2d 372.

■■ In the case at bar there is no evidence to support an inference that the sentence imposed upon defendant was intended to punish him for proceeding with a jury trial. Defendant's sentence is for a minimum term that is less than three times as great as the minimum term discussed during pretrial negotiations and is not unduly harsh or severe in view of the nature of the offense. Despite defendant's lack of a serious criminal record, the evidence adduced at trial establishes that the victim was murdered in a brutal and cold-blooded manner. The victim appears to have been murdered in retaliation for a verbal disagreement with defendant. Defendant poured gasoline directly upon the victim's body and ignited it.

---

[7] We note however, that the power of reviewing courts to reduce sentences should be exercised with considerable caution and circumspection because the trial judge ordinarily has a superior opportunity in the course of the trial and hearing in aggravation and mitigation to determine the appropriate sentence. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720.) This power is limited in use to those instances where the sentence imposed is at variance with the purpose and spirit of the law, or is greatly disproportionate to the offense. (*People v. Rivers* (1978), 61 Ill. App. 3d 376, 377 N.E.2d 1245.) Absent a clear showing of abuse of discretion, the sentence imposed by the trial court should not be altered by a reviewing court. *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.

This savage type of murder was perpetrated with complete disregard for the victim's two children who were sleeping in the same apartment, and for the other residents of the nine-unit apartment building. Moreover, defendant did so with enough forethought that he removed his own clothing from the apartment before he started the fire. These actions are an adequate basis for the imposition of the sentence.

In *People v. Dennis* defendant was found guilty of armed robbery and sentenced to a term of 40 to 80 years. During pretrial negotiations defendant was offered a term of two to four years if he would plead guilty. In reducing the defendant's sentence, the appellate court held at page 78:

> "Finally, we wish to make it clear that our holding that petitioner suffered a constitutional deprivation which must be remedied is limited to the facts of the instant case, namely a sentence imposed following a jury trial approximately 20 times greater than that offered during plea negotiations. We do not intend to erode the well-established principle that a mere disparity between the sentence offered during plea bargaining and that ultimately imposed, of itself, does not warrant the use of our power to reduce a term of imprisonment. * * *."

We cannot, therefore, conclude that defendant suffered a constitutional deprivation because the sentence imposed was greater than the sentence discussed at the pretrial conference.

### B.

Defendant also argues that the trial court's questioning, during the hearing in aggravation and mitigation, of Army Sergeant Sutton, a defense witness, was not impartial but rather a conscious effort to discredit Sutton. The State responds that the trial court's examination of Sutton was impartial and was not a conscious effort to discredit Sutton but merely an attempt to clarify the circumstances under which Sutton had known defendant.

Sutton testified that he had known defendant approximately 27 years and considered defendant a close friend. Sutton further testified that defendant got along well with others, was honest, and was again capable of taking an effective role in society. The colloquy to which defendant objects was an intensive probing by the trial judge to determine whether Sutton had ever observed defendant "* * * in a situation where he had some real anger and had some real emotional problems involved * * *."

■■ The hearing in aggravation and mitigation is not strictly a trial but rather an inquiry into pertinent facts and circumstances which will enable the trial judge to exercise the discretion imposed upon him in determining the length of sentence. Guilt has already been established. The defendant

stands before the court as a convicted felon seeking and hoping for mercy but entitled only to justice. The trial court is not bound by the usual rules of evidence found in criminal prosecutions but may search anywhere within reasonable bounds for other facts tending to aggravate or mitigate the sentence. *People v. Faulkner* (1957), 12 Ill. 2d 176, 183, 145 N.E.2d 632, *cert. denied* (1958), 355 U.S. 965, 2 L. Ed. 2d 540, 78 S. Ct. 556.

The cases cited by the parties are inapposite to the case at bar. Both *People v. Wesley* (1959), 18 Ill. 2d 138, 163 N.E.2d 500, cited by defendant, and *People v. Hopkins* (1963), 29 Ill. 2d 260, 194 N.E.2d 213, cited by the State, concern judicial examination during the course of trial, not during a hearing in aggravation and mitigation. It is not disputed that the property of judicial examination is determined by the circumstances of each case and rests largely within the discretion of the trial court. (See, *e.g.*, *Wesley*, at 155; *Hopkins*, at 265.) Nor is it disputed that such examination should always be conducted in a fair and impartial manner. (See, *e.g.*, *Wesley*, at 155; *Hopkins*, at 265.) However, judicial examination during the hearing in aggravation and mitigation does not share the same bounds as judicial examination during the course of trial. As we have previously noted, the rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry into aggravating and mitigating factors. (*People v. McWilliams* (1932), 348 Ill. 333, 336.) An objective reading of the proceeding does not disclose that the questions asked by the trial judge were motivated by any bias against defendant, or that the court assumed the role of an advocate in conducting its examination of Sutton. We cannot say that the course pursued by the trial court was improper under the circumstances existing in this case.

Accordingly, we conclude that there has been no abuse of the trial court's discretion which would entitle defendant to a reduction in his sentence or to a new sentencing hearing.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.