THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK CREQUE, Defendant-Appellant.

First District (6th Division)   No. 1—90—0793

Opinion filed May 17, 1991.

Jenner & Block, of Chicago (Sidney I. Schenkier and Michael T. Brody, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Frank Creque, was convicted by a jury of aggravated arson and three counts of felony murder for a fire at an apartment building in which three residents died. Judgment was entered on the verdicts, and the trial court sentenced defendant to natural life imprisonment on the felony murder counts and a concurrent 30-year term on the aggravated arson count.

The fire occurred in a four-story residential building in Chicago. On the ground level are a lobby, an office and five apartments, one of which defendant occupied. A wooden stairway runs from the lobby to each of the three upper floors with a fire door on each floor between the stairway and the hallway. It is undisputed that the fire began on the ground level in a couch left in the hallway by a former tenant. The three residents who died lived on the fourth floor. Several other residents were injured.

Greg Smith, who had known defendant for several years, testified for the State that on October 5, 1988, at about 1:30 p.m., he and defendant bought some beer, and then went to defendant's apartment. Evelyn Rigsby, with whom defendant shared the apartment, came home about 4:30 p.m. Soon thereafter, Thomas Viere, the building owner, came to the door and asked Rigsby for rent money. Defendant began to complain to Viere about a neighbor's barking dogs and items needing repair in the apartment. Viere informed defendant and Rigsby that he wanted them to vacate the apartment in two weeks so that the building manager could move in. After Viere left, defendant said that when he moved out, he was going to take down and destroy the kitchen cabinets. Defendant then went into a back room and returned with a white plastic container with a red lid.

Smith followed defendant into the hallway, where he watched defendant spray the front steps and the couch with the liquid from the bottle, then light a match and throw it on the couch, which went up in flames. Smith did not say anything to defendant or try to stop him. Smith further testified that he ran into the apartment and filled a green garbage pail with water from the bathroom. When he opened the door to the hallway, flames were over his head and the smoke was thick. He slammed the door shut and exited through the window with defendant and Rigsby. After Smith helped several people out of the building, he and defendant walked to the liquor store and bought more beer. Defendant warned Smith that if he told anyone about the fire, defendant would involve Smith.

Smith went to the police station at about 2:30 a.m., the following morning, after learning that the police were looking for him. The police spoke with Smith three times. Smith testified that he was afraid during the questioning because he thought that the police considered him a suspect. At first, he told police that he had not seen anything. When the police returned and told him that they had spoken to Rigsby, Smith told the police that he saw defendant go out into the hallway, but that he remained in the apartment. During the third interview with police, Smith said that he followed defendant into the hallway and watched him spray the stairway, hallway and couch and then set fire to the couch.

Rigsby testified for the State that she and defendant had lived together about seven years. Her testimony about the events prior to the fire substantially corroborated that of Smith. When Rigsby arrived home at about 4:30 or 4:45 p.m., defendant and Smith were in the apartment, drinking and listening to music. When Viere came, defendant berated Viere and threatened to report building code violations. When Viere told Rigsby that he wanted them to move out in two weeks, defendant said that they could stay for three months if they wanted. After Viere left, defendant told Rigsby that he was going to break the cabinets. Smith suggested that they spray paint the walls but then said that he was only kidding. Defendant went into the bedroom and returned with a white plastic container, which appeared to be the bottle of charcoal lighter fluid stored in the bedroom closet. Defendant and Smith went out into the hallway, returning two minutes later. They sat on the couch, opened another beer and neither appeared to be acting unusually. When Smith noticed smoke coming into the apartment from the hallway, he opened the door, quickly shut it and said the building was on fire. They all exited through a window to the outside.

Both Rigsby and defendant spoke to police at the scene, then went to the police station, where Rigsby remained for 22 hours without food or sleep. At first, she denied knowing anything because she was upset and scared. She did not think that defendant started the fire and did not want to get him in trouble. The police told her that three people died in the fire and that she could be charged with murder. They later told her that Smith blamed defendant for the fire. Eventually, she told the truth.

Detective William Baldree testified that he interviewed Smith, Rigsby and defendant at the police station. After Baldree told defendant of his conversation with Smith and Rigsby, including their accusations, defendant responded that no one could have seen him start the fire because he was in the hallway alone and that "no one could have seen him start anything." Defendant denied starting the fire.

Marshall Ronald Robinson of the Chicago fire department, a fire investigation expert, arrived at the fire scene at 6:50 p.m. He concluded from his observations that the fire originated in the couch and was intentionally set, based upon the lack of structural damage to the couch itself. He also stated that "something was poured on the couch to help the couch burn at the rate it did." His report, however, indicated that he observed no evidence of accelerant, "no low burning" and no other unusual burn patterns.

Detective Allen Falasz of the bomb and arson unit testified that he was assigned to do a follow-up investigation on the morning after the fire and was told an accelerant had been used and that the fire started in the couch. He arrived at the building at 9:20 a.m. and took four debris samples from the couch and one from the front stairwell. Falasz stated that he saw no evidence of tampering or alteration of the couch. Chemical analysis by William Tyrell, the State's expert, revealed that these samples contained a medium petroleum distillate, an accelerant. Tyrell could not identify the type of accelerant or state how long the chemical had been on the couch.

Viere testified for the State that he went to the apartment at about 5 p.m. to collect rent and to tell defendant and Rigsby that they were being evicted. Defendant became "adamant" and threatened to report Viere for building violations. Viere stayed for a few minutes, then left the building at about 6 p.m. to return to his nearby home. Viere returned to the building about 7:30 or 8 p.m. when he learned of the fire. He told police at the scene about his earlier discussion with Rigsby and defendant. The building was boarded up, and Viere remained on the premises through the night. He allowed two resi-

dents, who had no where else to sleep, to remain in the building overnight but no other people "came and went."

Ann Gentry, the resident manager, testified that she returned to the building for a short time on the morning after the fire to get some clean clothes from her apartment. She could not recall the precise time, but stated that it was sometime after she had a cup of coffee at a restaurant which opens at 5:30 a.m.

Detective Leon De Mars of the bomb and arson unit testified for the defense. De Mars investigated the scene on the evening of the fire. The sample he took from the couch tested negative and the report that he prepared later that evening stated that he observed no indications of an accelerant, pour patterns or low burning, signs of an intentionally set fire. On the next day, De Mars revised his report, deleting the references to the absence of evidence of accelerant and pour patterns. He also deleted his observation that the scene showed slow combustion with no low burning, even charring and extensive smoke, which could be evidence of an accidental fire. De Mars testified that the lack of evidence of a pour pattern does not necessarily indicate that an accelerant was not used. Whether a pour pattern is found depends on the amount of accelerant used, how long the fire burned in the area of the accelerant, the type of surface and the amount of water used to put out the fire.

The jury returned a guilty verdict on one count of aggravated arson and three counts of felony murder. The jury found defendant not guilty of the other three counts charging that he caused the death of the victims with the knowledge that his acts created a strong probability of death or great bodily injury. The judge entered judgment on the verdicts. At the sentencing hearing, the trial court found defendant ineligible for a capital sentence because the State failed to prove that defendant acted with an intent to kill or knew that his acts created a strong probability of death or great bodily harm. The court then found that it had no discretion and was required to sentence defendant to a term of natural life imprisonment on the felony murder convictions under the Uniform Code of Corrections. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(c).

On appeal defendant contends that the trial court erred in denying his pretrial motion to preclude death penalty proceedings; in admitting evidence of results of tests taken a day after the fire; in allowing the jury to review portions of the trial testimony; and in excluding certain evidence about an alternative cause of the fire. In addition, defendant maintains that he was not proved guilty beyond a

reasonable doubt and was improperly sentenced to a term of natural life.

■ Initially, we reject defendant's argument that the trial court improperly denied his motion to preclude death penalty proceedings. Defendant asserts that the trial court should have held a preliminary hearing before trial to determine whether death would be appropriate if defendant were found guilty. We disagree. Neither statutory nor case law requires such pretrial procedure and such proceedings would be inefficient and impractical.

The statute which outlines the death penalty proceedings unambiguously contemplates a separate sentencing hearing only after defendant is convicted or pleads guilty. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(d)(1).) Moreover, defendant's argument is inconsistent with our supreme court's decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 397 N.E.2d 809, which held that a prosecutor need not decide whether to seek a death penalty until after trial so the State can evaluate the testimony and evidence actually heard. (See also *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415.) It would be untimely to conduct a pretrial proceeding to determine the appropriateness of death penalty proceedings, as defendant suggests, because the State may consider evidence presented at trial in deciding whether to impose a death penalty. The court did not err in denying defendant's motion.

Defendant next argues that the trial court erroneously admitted evidence of the chemical analysis from debris collected on the day after the fire. Defendant does not allege any deficiency in the chain of custody after the samples were collected, but rather contends that there is no evidence that the debris was not tampered with prior to its collection from the couch.

■ Initially, we note that the propriety of the admission of evidence rests within the trial court's discretion and will not be reversed absent an abuse of that discretion. (*People v. Holman* (1987), 157 Ill. App. 3d 764, 510 N.E.2d 1139.) When evidence is subject to alteration or is not readily identifiable, the State must show a chain of custody of sufficient completeness to render it improbable that the evidence was tampered with or contaminated. (*People v. Slaughter* (1986), 149 Ill. App. 3d 183, 500 N.E.2d 662.) The State, however, is not required to exclude all possibility of tampering. *People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179.

■ We believe that the State presented sufficient evidence to prove chain of custody. The fire began sometime after 6 p.m. on October 5, 1988. The fire department received the call at 6:28 p.m., and

two crews reported within a "couple of minutes." Detective De Mars arrived at 7 p.m. to investigate and remained in the building for 3½ hours. Viere returned between 7:30 p.m. and 8 p.m., and stayed all night in the building, which had been boarded up. Although two residents remained overnight, no evidence suggests that others entered the secured building until morning when Gentry came to get clean clothing. Detective Falasz arrived at 9:20 a.m. the following morning and collected the samples which he submitted to the crime laboratory for analysis. Based upon this testimony, we find it improbable that the debris evidence on the couch was tampered with or altered. We disagree with defendant's assertion that the couch was open to "public access" for 15 hours. The only persons in the building were members of the Chicago police and fire departments, the building owner and two residents who were allowed to stay. Nor is the State's failure to identify or call as witnesses the two residents who remained overnight fatal to its proof of chain of custody. See *People v. Bradney* (1988), 170 Ill. App. 3d 839, 525 N.E.2d 112.

We find *People v. Jackson* (1980), 89 Ill. App. 3d 461, 411 N.E.2d 893, instructive. In *Jackson*, this court rejected the same argument raised here about the admissibility of debris samples from an arson fire. In that case, there was a two-hour lapse between the fire and the recovery of the debris samples from the victim's apartment. The court focused on the "continuous presence of fire, police and investigative personnel," who extinguished the fire and investigated the scene. The court also noted that "[t]he fact that more stringent protective techniques were not employed goes to the weight or the credibility of the evidence in contrast to its admissibility." (*Jackson*, 89 Ill. App. 3d at 473, 411 N.E.2d at 902.) The court accordingly concluded that the evidence was properly admitted.

As in *Jackson*, the evidence here established the uninterrrupted presence of fire and police personnel from 6:30 p.m. until 10:30 p.m. on the evening of the fire. The only persons who remained after the building was subsequently boarded up were Viere and two residents. According to Viere, no one else entered the building. Although better practice might require that a guard be present to safeguard the scene during an arson investigation, the lack of better measures only affects the weight, not the admissibility, of the evidence.

■■ We also reject defendant's argument that the presence of contradictory test results from samples taken within a 15-hour period suggests alteration or tampering of the couch. In our view, this alone is insufficient to create a "tangible suggestion" that the couch was tampered with or altered. (*People v. Holman*, 157 Ill. App. 3d at 776,

510 N.E.2d at 1146.) Investigators took only one sample from the couch on the evening of the fire, whereas they took four samples from different parts of the couch on the following morning. Certainly, four samples taken in the absence of proof of tampering are more reliable than one sample.

Defendant directs our attention to *People v. Slaughter* (1986), 149 Ill. App. 3d 183, 500 N.E.2d 662, and *People v. Brown* (1972), 3 Ill. App. 3d 879, 279 N.E.2d 382. In both cases, there was no evidence that access was restricted to the area where the evidence was stored. Moreover, we find these cases distinguishable because both courts relied upon the lack of testimony that the evidence was properly inventoried, labelled or sealed. Such a complete break in the chain of custody is not present in this case. In the absence of any indication of tampering or alteration, we believe that the protective measures taken were sufficient to render admissible the evidence regarding analysis of the debris samples. The testimony of the crime laboratory chemist, therefore, was properly admitted.

Defendant also claims that the trial court erred in excluding certain testimony as irrelevant. After several witnesses testified that former residents had used the chemical toluene as a drug, defendant sought to introduce a neurologist's testimony on the use and effect of toluene, particularly in the Uptown area, and its tendency to cause accidental fires. The trial court excluded the testimony. On appeal, defendant asserts that this evidence provided an alternative explanation for the fire's origin.

A trial court in its discretion may reject evidence as irrelevant if it has little probative value because of its remoteness or uncertainty. (*People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) Further, we will not reverse such ruling absent an abuse of discretion. *People v. Ward*, 101 Ill. 2d 443, 463 N.E.2d 696.

Our supreme court recently considered this issue under analogous circumstances. (*People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755.) In *Morgan*, defendant sought to introduce evidence of heavy drug traffic near the apartment where the murder victim's body was found. Defendant argued that this evidence bolstered his theory that the victim, a drug dealer, was murdered during a drug deal by someone other than defendant. The supreme court found such argument "incredibly speculative" and found that the trial court's ruling excluding the evidence was not an abuse of discretion. (*Morgan*, 142 Ill. 2d at 460, 568 N.E.2d at 773.) Other Illinois courts found evidence that another person may have committed the crime too speculative and insufficient to permit its admission. See *People v. Dukett* (1974), 56 Ill.

2d 432, 308 N.E.2d 590; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733; *People v. Bryant* (1982), 105 Ill. App. 3d 285, 434 N.E.2d 316.

█ Under *Morgan*, we find that the evidence in this case connecting toluene use to the fire was speculative and too unspecific. The evidence suggested that although several residents may have used toluene, these persons moved out one month before the fire. No evidence was adduced at trial to suggest that these toluene users or anyone else inadvertently spilled toluene on the couch or used the chemical anywhere near the couch at any time, let alone immediately prior to the fire. There is simply no evidence connecting the fire to the toluene use. We conclude that the trial court did not abuse its discretion in excluding the neurologist's testimony.

Defendant next contends that the jury's review of Detective Baldree's direct examination during its deliberations placed undue emphasis on his testimony and deprived defendant of a fair trial.

██ █ Initially, we note that the decision to grant or refuse a jury's request for review of testimony rests within the trial judge's discretion and will not be disturbed on appeal absent an abuse of discretion. (*People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.) In its discretion, the trial court first determines whether reviewing testimony would be helpful or harmful to the jury's deliberations. A "plausible starting point" is the jury's belief that such testimony would be helpful. (*People v. Sanders* (1984), 127 Ill. App. 3d 471, 475, 469 N.E.2d 287, 291.) A trial court does not abuse its discretion by permitting review of only prosecution witnesses (*People v. Reyes* (1982), 108 Ill. App. 3d 911, 439 N.E.2d 1089), or allowing review of direct examination without the related cross-examination (*People v. Reynolds* (1978), 57 Ill. App. 3d 593, 373 N.E.2d 650). Further, appropriate reasons for denying such request include difficulties in obtaining transcripts, availability of court reporters and concern about trial delay. *People v. Frisby* (1987), 160 Ill. App. 3d 19, 512 N.E.2d 1337.

█ The record reveals that the trial court first determined what testimony would be helpful to the jury, then exercised its discretion reasonably under the circumstances. At 11:55 a.m., the jury requested transcripts of all trial testimony. The court informed them that no transcripts were available and instructed them to continue to deliberate. At 4:15 p.m. on the same day, when the jurors again inquired about the trial transcripts, the judge pinpointed the particular testimony requested, "the prosecution's direct testimony" of Baldree and the entire testimony of Smith and Rigsby. The court reporter who was present on this day indicated that she recorded Baldree's testimony

and that two other reporters recorded Smith and Rigsby. The trial judge attempted to locate the two court reporters or their notes. When the reporters or notes could not be found, the court asked the jury whether they wanted to review only Baldree's testimony, to which they responded affirmatively.

■ Defendant maintains that the jury's review of Baldree's direct examination without the relevant cross-examination and without the testimony of Smith and Rigsby placed undue influence on Baldree's testimony. We disagree. The jury did not request Baldree's cross-examination and presumably did not feel it would be helpful. Moreover, the jury heard Baldree's cross-examination at trial and witnessed his manner and demeanor. (*People v. Reynolds*, 57 Ill. App. 3d 593, 373 N.E.2d 650.) The circumstances surrounding the jury's request indicate that the judge acted within his discretion in proceeding without the review of the testimony of Smith and Rigsby. It is noteworthy that it was late in the day, two different court reporters recorded this testimony, and neither was immediately available. (*People v. Frisby*, 160 Ill. App. 3d 19, 512 N.E.2d 1337.) Also, the trial judge could have reasonably determined in his discretion that to grant the jury's request for Smith's and Rigsby's testimony would impede the progress of the trial. (*People v. Reynolds*, 57 Ill. App. 3d 593, 373 N.E.2d 650.) Nor do we believe that the defense was hindered because the jury did not review the testimony of Smith and Rigsby. Under the circumstances, the trial court properly exercised its discretion in granting the jury's request to review Baldree's direct examination testimony.

*People v. Sanders* (1984), 127 Ill. App. 3d 471, 469 N.E.2d 287, and *People v. Martin* (1980), 84 Ill. App. 3d 822, 406 N.E.2d 49, cited by defendant to support his argument that the failure to review Baldree's cross-examination testimony resulted in undue emphasis, are factually distinguishable from the present case. In *Martin*, the trial court allowed the jury to review the testimony of a witness who testified at the first trial but died before second trial. In *Sanders*, the trial court explained that the lack of complexity in the trial, the issues and the testimony of the witness mitigated against allowing the jury's request. This court upheld the trial court's determination. Thus, these cases do not support defendant's claim that failure to read the entire testimony resulted in undue emphasis, but rather support a trial court's discretion in assessing whether a review of testimony will help or harm jury deliberations. Here, the trial court properly exercised its discretion.

Defendant next contends that he was not proved guilty beyond a reasonable doubt because the only direct evidence, Smith's testimony, was inconsistent and incredible.

A reviewing court will not reverse a conviction unless, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Geneva* (1990), 196 Ill. App. 3d 1017, 554 N.E.2d 556.) It is the trier of fact's function to determine the credibility of the witnesses, the weight to be given to their testimony and the reasonable inferences to be drawn from the evidence. (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) Further, the trier of fact is also charged with resolving conflicts or inconsistencies in the testimony of witnesses (*People v. Phillips* (1989), 127 Ill. 2d 499, 538 N.E.2d 500), and assessing questions of credibility when a witness's pretrial statements differ from his trial testimony. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.

■■■ Applying these principles, we find that the evidence was not so improbable or unsatisfactory as to create reasonable doubt concerning defendant's guilt. Both Smith and Rigsby saw defendant leave the apartment with a plastic bottle. Smith watched defendant spray a liquid onto the steps, hallway and couch, then throw a lit match onto the couch. Although defendant told police that he was in the hallway alone, Rigsby testified that after defendant came from the bedroom with a plastic bottle, both men left the apartment and returned after two minutes. Rigsby thus corroborated Smith's testimony that he saw defendant set the couch on fire. The expert opinion of Detective Falasz that the fire was intentionally set also substantially corroborates Smith, as does Investigator Robinson's testimony that the fire was "intense and fast moving."

We do not believe that Smith's inconsistent statements at the police station regarding the events create reasonable doubt. Although Smith initially told police that he was not in the hallway, he later gave police the same account of the events that he testified to at trial. Given Smith's friendship with defendant and his fear of being considered a suspect, we believe that a rational trier of fact could find Smith credible, even though he initially did not disclose his observations. Moreover, such resolution of conflicting evidence is a function for the jury. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277.) The jury similarly heard evidence about De Mar's revised report. We cannot state that this evidence creates reasonable doubt.

The supreme court has rejected defendant's argument that the circumstantial evidence must exclude reasonable hypotheses of inno-

cence. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) And as indicated above, the circumstantial evidence corroborates Smith's testimony. We find that defendant was proved guilty beyond a reasonable doubt.

Finally, defendant argues that section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1) is ambiguous because defendant's convictions for multiple murders committed without intent to kill are insufficient to support a discretionary sentence under subsection (a)(1)(b) of the Code, but form the conclusive basis for a mandatory natural life sentence under subsection (a)(1)(c). Because these provisions are in conflict, he maintains that we must consider the statute's legislative history.

Section 5—8—1(a)(1) requires the court to set a 20- to 40-year sentence of imprisonment for murder, but also provides the following discretionary and mandatory provisions:

> "(b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court *may* sentence the defendant to a term of natural life imprisonment, or (c) if the defendant has previously been convicted of first degree murder under any state or federal law or is found guilty of murdering more than one victim, the court *shall* sentence the defendant to a term of natural life imprisonment." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1).)

The defendant maintains that these sections read in tandem reveal an ambiguity in the statute and require resort to legislative history.

Defendant relies on *People v. Winchel* (1987), 159 Ill. App. 3d 892, 512 N.E.2d 1298, to support his contention that the statute is ambiguous. In *Winchel*, the defendant argued that multiple murder is a factor in imposing both a discretionary natural life sentence under subsection (a)(1)(b) of section 5—8—1 and a mandatory natural life sentence under subsection (a)(1)(c). This court concluded that section 5—8—1 was ambiguous, but resolved the conflict after considering the legislative history and rules of statutory construction. The court found that the legislature "intended to make a mandatory natural life sentence the controlling sentencing provision for those convicted of, *inter alia*, multiple murder. That is, under subsection (a)(1)(c), multiple murderers are required to be sentenced to a natural life term where a death sentence is not imposed." (*Winchel*, 159 Ill. App. 3d at 921, 512 N.E.2d at 1316.) The court also reached the same conclusion by apply-

ing statutory construction rules. Thus, although the *Winchel* court recognized an ambiguity in section 5—8—1, as defendant maintains, the court resolved the conflict.

Indeed, since *Winchel*, under facts similar to the instant case, our supreme court has held that the statute mandates a natural life imprisonment for the murder of two or more persons. (*People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 518 N.E.2d 1047.) In *Strayhorn,* defendant was convicted of murdering three firefighters, who died fighting the arson fire for which defendant was responsible. The trial judge sentenced defendant to two 40-year concurrent sentences and a consecutive 30-year term, after concluding that sufficient mitigating factors existed to preclude imposition of the death penalty. The supreme court found that after refusing to impose the death penalty, the trial judge had no discretion in sentencing defendant because "[t]he statute unequivocally mandates natural life imprisonment for the murder of two or more persons." *Strayhorn*, 119 Ill. 2d at 336, 518 N.E.2d at 1050. See also *People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113, *People v. Gant* (1990), 202 Ill. App. 3d 218, 559 N.E.2d 923.

We are unpersuaded by defendant's argument that *Strayhorn* is distinguishable because it did not concern ambiguity between two sections of the same statute. The issue in *Strayhorn* was whether a trial judge was compelled to impose a natural life sentence upon a defendant convicted of multiple murders. After setting out the statute, including both the discretionary and the mandatory natural life imprisonment provisions, the court determined that the statute mandated natural life imprisonment for multiple murders. In so deciding, we presume the court considered the entire statute, including subsection (a)(1)(b). Although neither party in *Strayhorn* asserted an ambiguity within the statute itself, we refuse to decline to follow it on this basis. Nor do we find the factual distinctions between the cases important.

We will not resort to legislative history when the intent can be ascertained from the statutory language. (*People v. Bryant* (1989), 128 Ill. 2d 448, 539 N.E.2d 1221.) The language of subsection (a)(1)(c) of section 5—8—1 clearly requires life imprisonment of a defendant "found guilty of murdering more than one victim." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(c).) For purposes of this statute, the legislature did not distinguish between types of first degree murder and presumably intended that any defendant convicted of multiple murders be sentenced to natural life imprisonment. Moreover, the supreme court in *Strayhorn* found such interpretation "unequivocal." (*Strayhorn*, 119 Ill. 2d at 336, 518 N.E.2d at 1050.) Because we do

not find the statute ambiguous, we are neither permitted nor required to consider legislative history.

Here, the jury found defendant guilty of the first degree murders of three people under section 9—1(a)(3). (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3).) We conclude that the trial judge properly determined that the statute required a term of natural life imprisonment and so imposed one.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and LaPORTA, JJ., concur.