THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL MODROWSKI, Defendant-Appellant.

First District (2nd Division)   No. 1—95—1993

Opinion filed May 19, 1998.—Rehearing denied June 18, 1998.

Richard E. Cunningham, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth McCurry, and James Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Paul Modrowski, and codefendant, Robert Faraci, were charged with first-degree murder for the shooting death of Dean Fawcett. Following simultaneous dual jury trials, codefendant was acquitted while defendant was convicted. On appeal, defendant argues that reversible error occurred where: (1) the trial court refused to give curative jury instructions following the prosecution's misstatement of accountability law; (2) the State introduced improper prior inconsistent statements as substantive evidence and for impeachment purposes; (3) the trial judge abused his discretion in refusing the jury's request for transcripts of a key witness' testimony; (4) defendant received ineffective assistance when counsel failed to request that the jury be given counsel's copy of a key witness' testimony and failed to offer a written prior inconsistent statement as substantive evidence; (5) prosecutorial misconduct deprived defendant of a fair trial; and (6) the sentence imposed, life imprisonment, was unfairly disparate and excessive.

BACKGROUND

On January 18, 1993, a woman and her daughter were walking along railroad tracks near their home in Barrington, Illinois, when they discovered a human body in the snow near the tracks. The woman immediately called law enforcement authorities to the scene, where Barrington police and Illinois State Police found the body in a frozen state with its head, left arm, and right hand missing. No identification was found on the body, but the police found two phone numbers on a note in clothing on the body. The phone numbers led the police to Nadine Lenarczak (Lenarczak), who provided information that led police to determine that the body was that of 22-year-old

Dean Fawcett (Fawcett). A missing persons report, DNA testing, and records showing that Fawcett purchased the shoes and eyeglasses found near the body confirmed that the victim was Fawcett.

The evidence in the instant case established that, on December 1, 1992, Fawcett had opened a checking account with a $100 deposit at a bank in Berwyn, Illinois. From December 22 through December 27, 1992, Fawcett wrote over 40 bad checks against that account. During that period, he was frequently accompanied by his friends, Briente Palazaeno (known as Brian Palasz), Mr. and Mrs. Robert and Rose Faraci, Paul Modrowski (Modrowski), and Lenarczak. Each person in this group enjoyed benefits from the proceeds of Fawcett's check-writing spree.

At trial, Lenarczak testified that, on December 27, 1992, after purchasing goods with bad checks along with Robert Faraci (Faraci), Modrowski, Fawcett, and Palasz, the group returned to Lenarczak's motel room and ordered food. Faraci and Fawcett left to pick up the food, while Palasz and Modrowski remained at the motel room, speaking in low voices away from Lenarczak. After Faraci and Fawcett returned with the food, Lenarczak spoke with Fawcett privately. She warned him that he would likely get caught for writing the bad checks. Fawcett replied that he intended to move to California and that, if he was apprehended by authorities, he would tell the police everything about the check-writing scheme. Faraci then interrupted the conversation between Lenarczak and Fawcett and took Fawcett aside. Lenarczak subsequently warned Faraci that he should arrange for Fawcett to go to California to help ensure that Fawcett would not implicate everyone else in the check-writing scheme.

Lenarczak also testified that, the following morning, Fawcett telephoned her from a hotel where he had been staying and complained that his wallet, identification, and checks were missing. Fawcett stated to her that Faraci and Modrowski were supposed to pick him up from his hotel and that he suspected the two men of stealing the aforementioned items. Lenarczak then went to pick up Fawcett and drove him back to her motel, where he tried to telephone Faraci. When Fawcett and Lenarczak prepared to leave the motel soon thereafter, Faraci and Modrowski arrived in Faraci's car. According to Lenarczak, Modrowski jumped out of the car, opened the passenger door of Lenarczak's car, and told Fawcett to get out. Modrowski and Fawcett argued for a short time about the missing wallet and checks, and then Modrowski pushed Fawcett into the back seat of Faraci's car as Fawcett demanded to be taken home. Lenarczak stated that that was the last time she saw Fawcett.

Palasz also testified at trial, stating that he, Modrowski, Faraci,

and Fawcett were friends. Palasz' testimony largely corroborated that of Lenarczak, with some exceptions. He denied, for instance, that Lenarczak told him that Fawcett might inform the police of the group's illegal activities. He also denied that there was any discussion about killing Fawcett on December 27, 1992. Palasz did admit, however, that on December 23, he was present during a conversation with Faraci and Modrowski in which the killing of Fawcett was proposed. Palasz testified at trial that, while he could not recall certain details, Modrowski did not state during that conversation that he wanted Fawcett killed. The State then confronted Palasz with his prior testimony given before a grand jury in which he gave a detailed account of statements made by Modrowski that evinced his intent to kill Fawcett. Palasz acknowledged his grand jury testimony, but argued that the incriminating statements of the conversation were made by Faraci and that Modrowski was merely relating Faraci's statements to Palasz at a point in the conversation when Faraci left Palasz and Modrowski alone. However, Palasz did admit that, upon Faraci's return to the conversation, there was a mention of killing Fawcett. Once again, Palasz was confronted with additional prior grand jury testimony in which he described that Modrowski desired to kill Fawcett.

Rose Faraci (Mrs. Faraci) testified that she married Robert Faraci in April 1992. She stated that Palasz lived with the couple until she ejected him. Sometime later, Modrowski moved in to live with the Faracis. Mrs. Faraci stated that she never knew Modrowski by his true name, but only by the name Viktor Himmler. Mrs. Faraci acknowledged being a party to the fraudulent check-writing scheme and admitted that she knew that Fawcett was already dead when she forged one of his checks on January 6, 1993. Soon thereafter, the Faracis moved to Florida, followed immediately by defendant. Mrs. Faraci testified that she and Modrowski rented an apartment there as husband and wife under the names Rosalie Rugo and Viktor Himmler. All three lived in the apartment, but Robert Faraci did not sign the lease. Mrs. Faraci testified that the three stayed in Florida for approximately three months and that the Faracis subsequently returned to Chicago after Modrowski had returned.

Deputy Chief Investigator John Robertson was one of over 40 witnesses who testified in the case. Robertson testified that defendant admitted in a statement while in police custody that he offered Faraci the use of his car to effectuate the killing of Fawcett and that, before and after the shooting, he had concealed the 9 millimeter gun that Faraci used to kill Fawcett. At the close of the proceedings, the jury found Modrowski guilty of first-degree murder under a theory of

accountability. The trial court found that defendant was eligible for the death penalty, but sentenced him to life imprisonment without the possibility of parole due to the trial judge's belief that Modrowski may not have been present during Fawcett's murder. Defendant brings the present appeal from that judgment.

We affirm.

ANALYSIS

Defendant first contends that the trial court erred by refusing to declare a mistrial or give a curative instruction after the prosecution misstated the law of accountability to the jury during rebuttal argument. We note that defendant failed to make a timely objection following the remarks in question and waited until rebuttal argument was complete and the jury was instructed on the law and excused to deliberate before making its motion for a mistrial. Consequently, defendant waived this issue on appeal, and this court, therefore, may only review the issue under the standard of plain error. *People v. Hayes*, 139 Ill. 2d 89, 143 (1990). The plain error rule is not a blanket savings provision, however, and is invoked only in exceptional cases where the evidence is closely balanced or where the alleged error was so prejudicial that it denied the defendant a fair trial. *Hayes*, 139 Ill. 2d at 143.

■ One is accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1992). Although accountability requires that the assistance of an accused occur prior to or during the commission of the unlawful act, such assistance may be inferred from activities occurring after the offense. *People v. Ruiz*, 94 Ill. 2d 245, 257 (1982); *People v. Foster*, 198 Ill. App. 3d 986, 993, 556 N.E.2d 1214, 1219 (1990). For instance, the subsequent concealment or destruction of evidence is a factor that may be considered by the fact finder in determining whether the accused aided in the commission of the offense. *People v. Johnson*, 220 Ill. App. 3d 550, 555, 581 N.E.2d 118, 122 (1991).

In the case *sub judice*, the prosecutor summarized the evidence supporting a guilty verdict under the theory of accountability. This evidence essentially consisted of defendant's discussions of killing Fawcett, defendant's offering Faraci the use of a gun and his car to facilitate the murder, and defendant's subsequent concealment of the gun. The prosecution followed this summation with a verbatim recitation of Illinois Pattern Jury Instructions, Criminal, No. 5.03 (3d ed. 1992) regarding accountability.

Defense counsel's subsequent closing argument at one point focused upon the language of the accountability statute requiring that defendant's assistance must have been "before or during" the commission of the offense. Defense counsel then argued that defendant's concealment of the gun occurred after the offense and implied that defendant, therefore, should not be found guilty under the charge of accountability, since his involvement at most implicated him as an accessory after the fact.

In rebuttal closing argument, the prosecution responded as follows:

> "Now, counsel says, 'Well, wait a second. Accountability happens if its [sic] before or during the commission of the crime. Hiding the gun after Dean is killed is after.' Wrong. Folks, the crime is still happening until they get caught. Hiding the gun in Florida and taking it with them wherever he went is part and partial [sic] of the commission of the crime. It's still happening. *** So the concealment of evidence of the murder weapon is part of the commission of the offense."

Defendant claims that the State's remarks prejudiced defendant by leading jurors to believe that one could be found guilty under the theory of accountability under facts showing that defendant was only an accessory after the fact. Defendant argues that the prejudice was compounded by the fact that the prosecution's misstatement occurred during rebuttal closing argument without a subsequent curative instruction by the trial court or an opportunity for the defense to respond to the jury. Initially, we agree with defendant that the above rebuttal remarks concerning accountability and the completion of the crime of murder were incorrect statements of the law. Our supreme court recently clarified this issue in *People v. Dennis*, 181 Ill. 2d 87 (1998), when it stated:

> "Based upon the plain language in our accountability statute, we conclude that, for purposes of accountability, the duration of the commission of an offense is defined by the elements of the offense. *** Consistent with our accountability statute, a defendant may be held accountable for the commission of [an offense] if, either before or during the commission of the offense, *he aided or abetted [the offender] in 'conduct which is an element of [the] offense.'* " (Emphasis added.) *Dennis*, 181 Ill. 2d at 101.

Therefore, in the context of criminal accountability, analysis of when the crime of first-degree murder is complete is determined by the elements of first-degree murder. In light of this rule, it was patently incorrect for the prosecution to state that the applicable law deems concealment of a murder weapon an element of the crime of murder and that the crime is not complete until the perpetrator is finally ap-

prehended. The commission of an offense is completed when the elements of that offense are satisfied. See *Dennis*, 181 Ill. 2d at 102 (commission of armed robbery ends when force and taking, the elements that constitute the offense, have ceased). The State's rebuttal to defense counsel's attempt at convincing the jury that defendant's conduct was that of an accessory after the fact would have been correct if it had stated that factors such as postoffense concealment may be considered to infer defendant's involvement in the homicide. *Ruiz*, 94 Ill. 2d at 257; *Foster*, 198 Ill. App. 3d at 993, 556 N.E.2d at 1219.

■ Nevertheless, we disagree with defendant that the prosecution's incorrect statement of the law "deflected" the jury from its ability to follow the correct accountability instructions that were given. We note that the defense read the correct jury instruction on accountability to the jury prior to the State's rebuttal argument. Additionally, the jurors were given correct instructions after closing arguments. Moreover, the trial court made repeated admonishments to the jury about the nature of closing arguments and the fact that jurors were to rely only on the statements that were based on the evidence. See *People v. Thompkins*, 121 Ill. 2d 401, 445 (1988) (prosecutors are afforded great latitude in closing argument, and improper remarks merit reversal only when they cause substantial prejudice to defendant). These factors militate in favor of a determination that defendant was not prejudiced by the State's incorrect closing argument. See *People v. Walker*, 230 Ill. App. 3d 377, 395-97, 594 N.E.2d 1252, 1264-66 (1992); *Johnson*, 220 Ill. App. 3d at 563, 581 N.E.2d at 128. Considering that the jury was presumed to understand the correct instructions given and that the jury here raised no questions with respect to the accountability instructions, we conclude that neither curative jury instructions nor the granting of defendant's motion for a mistrial was justified.

Defendant relies on *People v. Weinstein*, 35 Ill. 2d 467 (1966), a case where the supreme court held that repeated, prejudicial prosecutorial comments impeded the jury's ability to fairly consider evidence and warranted reversal. However, *Weinstein* is inapposite because, in the instant case, the prosecution uttered a single misstatement of law. Here the prosecutor did err in argument. Nevertheless, the prosecutor's error was harmless, since the State introduced substantial evidence against defendant and, in our view, the evidence against defendant was not close.

Next, defendant contends that the admission of Palasz' grand jury testimony as substantive evidence and his similar oral statements to police as impeachment was improper. Defendant argues

that it was error to admit Palasz' prior inconsistent statements, since Palasz' testimony at trial was not damaging to the State's case. We disagree.

■ In *People v. Weaver*, 92 Ill. 2d 545 (1982), the Illinois Supreme Court explained the circumstances under which a party may introduce a prior inconsistent statement:

> "A court's witness, or any other witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support[,] the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *Weaver*, 92 Ill. 2d at 563-64.

We note that, two years after *Weaver* was decided, our legislature enacted section 115—10.1 of the Illinois Code of Criminal Procedure of 1963, which provides in pertinent part:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
>> (1) was made under oath at a trial, hearing, or other proceeding, or
>>
>> (2) narrates, describes or explains an event or condition of which the witness had personal knowledge, and
>>
>>> (A) the statement is proved to have been written or signed by the witness, or
>>>
>>> (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding ***." 725 ILCS 5/115—10.1 (West 1992).

In the instant case, the State called Palasz as a witness. Palasz gave testimony favorable to the State's case, including statements corroborating many details of the check-writing scheme and defendant's presence with Fawcett during the accompanying shopping sprees. Nevertheless, during direct examination, Palasz denied that defendant had told him, during the December 23, 1992, conversa-

tion, that he wanted Fawcett killed. The State then confronted Palasz with his prior grand jury testimony, in which Palasz stated:

"We are in Schiller Park outside of Faraci's residence, inside of Faraci's car. Paul [Modrowski] is in the front seat. I was in the back seat. Bob [Faraci] went in and get [sic] something from the apartment. Paul is planning to run from the warrant out of Du[P]age County. Then he starts saying that he thinks he should kill Dean Fawcett because of the checks. I tell him right away, no, that is stupid. *** I said there is no way this is going to happen. He says, well I think it should. *** He looks at me and said I really don't like Dean that much."

Palasz then admitted making the above statements, but claimed that defendant had simply been repeating remarks made earlier by Faraci and that the "he" to whom Palasz was referring was Faraci, not defendant.

Palasz then testified that, following the aforementioned conversation with defendant, Faraci returned to the car and resumed a discussion in which there was a mention of killing Fawcett without any elaboration. The State once again confronted Palasz with his grand jury testimony wherein the following colloquy occurred:

"Q. Did he refer or tell people that he should kill Dean Fawcett?
A. Yes. He basically tried. Paul said he wanted to. Then I basically talked to Paul, and he said he considered running with Dean and not doing nothing [sic] to Dean. And Bob was basically trying to persuade him to kill him."

In addition, when Palasz was unable to recall defendant telling him that he would make Fawcett "disappear," Palasz was confronted with his grand jury testimony in which he stated that defendant, indeed, told Palasz that "he's going to disappear." Again, Palasz claimed that the "he" to whom he had been referring could have been either defendant or Fawcett.

As to the above statements and inquiries, defendant argues that it was error to permit the prosecution to use Palasz' grand jury testimony as substantive evidence under section 115—10.1. In support of his position, defendant cites *Weaver*, wherein the prosecution impeached its own witness with a minor discrepancy in the witness' prior grand jury testimony. The supreme court in that case held that the grand jury testimony could not be used as substantive evidence, as there was no existing exception to the hearsay rule permitting such a use, and that the use also constituted improper impeachment, since the witness' in-court testimony did not damage the State's case. *Weaver*, 92 Ill. 2d at 563-65.

In light of the subsequent enactment of section 115—10.1 and

subsequent case law applying that provision, we find defendant's reliance on *Weaver* to be misplaced. See *People v. Flores*, 128 Ill. 2d 66 (1989) (witness' testimony claiming no memory of facts surrounding alleged offense held to be "inconsistent," making detailed grand jury testimony admissible); *People v. Morales*, 281 Ill. App. 3d 695, 666 N.E.2d 839 (1996).

■ Furthermore, we are of the opinion that Palasz' testimony at trial can be properly characterized as inconsistent with his grand jury testimony. His in-court denials were not merely disappointing to the State's case, since the State very likely would have been damaged to the extent that the jury believed Palasz' trial testimony on the issue of defendant's knowledge and involvement in the planning of Fawcett's murder. Our determination that Palasz' prior statements were inconsistent is supported by case law holding that, to be inconsistent and, therefore, admissible as substantive evidence under section 115—10.1, a witness' prior statement need not directly contradict his or her testimony, but need only have a tendency to contradict it. *People v. Lee*, 243 Ill. App. 3d 745, 749, 612 N.E.2d 922, 924 (1993). *Weaver* is inapplicable to this issue by virtue of its focus on limiting prior inconsistent statements for impeachment purposes. Indeed, the supreme court in *Weaver* recognized that case's limitations by stating that inconsistent grand jury testimony could not be used as substantive evidence "unless and until we decide that in this State such prior statements can be used against a defendant as substantive evidence." *Weaver*, 92 Ill. 2d at 564-65. Since the complained-of statements used by the State satisfied all of the requirements of section 115—10.1, we conclude that their use as substantive evidence was proper.

■ We are similarly unpersuaded by defendant's contention that he suffered reversible prejudice from the State's improper impeachment by means of prior inconsistent oral statements made by Palasz to a detective. During the State's direct examination of Palasz, the prosecution questioned the witness with respect to the conversation that allegedly occurred between Palasz and defendant in Lenarczak's motel room on the night of December 27, 1992, while Faraci and Fawcett left to pick up carry-out food. Specifically, Palasz denied that there was any discussion of killing Fawcett during that conversation. The State also questioned Palasz about which road Palasz had earlier claimed he had dropped Fawcett off at the following morning. Palasz testified that he believed that he dropped Fawcett off at River Road.

The State then confronted Palasz with his own prior handwritten statements given to a detective in the case. The prosecution impeached Palasz with a statement given to the detective in which Palasz stated that defendant had told him on the night in question

that they had "to get rid of Dean" and that they "should whack Dean Fawcett." Palasz was also confronted with his own prior statement wherein he claimed that he dropped Fawcett off the next morning at Mannheim Road and Lawrence Court.

Defendant once again invokes *Weaver* in support of his contention that the above impeachment was improper in light of the nondamaging nature of Palasz' testimony preceding impeachment. Upon review of the record, we conclude that the above prior statements were sufficiently contradictory to justify the State's impeachment. In our view, Palasz' contradictory statements to the detective did not constitute minor discrepancies compared to his trial testimony, and, thus, the prosecution's impeachment was not improper. Assuming, *arguendo*, that there was any impropriety in the above impeachment, we deem it harmless error in light of the fact that the key impeachment here involved the issue of discussions establishing defendant's intent to have Fawcett killed—testimony that we have concluded was already properly admissible as substantive evidence. Moreover, considering that defendant failed to make timely objections and a posttrial motion regarding the use of the above prior inconsistent statements, this issue may only be reviewed under the plain error standard. In our opinion, however, the above impeachment did not deprive defendant of a fair trial in the instant case.

■ Defendant also argues that the trial court abused its discretion in refusing the jury's request for transcripts of Palasz' testimony. As a rule, the issue of whether to grant or deny a jury's request to review evidence or transcripts of witnesses' testimony lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *People v. Williams*, 173 Ill. 2d 48, 87 (1996). Transcripts of testimony may be made available to the jury if the jury makes such a request and if the trial court, in its discretion, believes that the transcripts will be helpful to jurors. *Flores*, 128 Ill. 2d at 93. Where the jury itself requests the opportunity to examine transcripts of the testimony, the trial court must assume that the jury believes that such review would be helpful. *People v. Martin*, 84 Ill. App. 3d 822, 826, 406 N.E.2d 49, 52 (1980).

In the instant case, shortly after deliberations commenced, the jury requested transcripts of Palasz' grand jury testimony as well as the entire transcript of defendant's trial. The court initially denied the jury's request, reasoning that the trial had lasted one month, that daily transcripts had not been ordered, that granting the jury's request would have been too burdensome on the court reporter's office, and that there would have been significant delay in the deliberation process. The trial court then noted that the transcript of Palasz'

grand jury testimony had been received as an exhibit and that portions thereof had been admitted as substantive evidence. Accordingly, the trial court allowed the jury to inspect a redacted copy of that portion of Palasz' grand jury testimony received as substantive evidence, reasoning that, because the jurors had lacked the opportunity to observe Palasz before the grand jury, the jurors had no recollection of that testimony upon which to rely. The trial court denied the jury's subsequent requests for a copy of Palasz' handwritten statement based on the fact that it had not been admitted into evidence. The court also denied its request for Palasz' entire grand jury testimony.

We find no error in the trial court's rulings as to the foregoing jury requests. We do not believe that it was an abuse of discretion for the trial court to provide a redacted version of Palasz' grand jury testimony reflecting only that portion submitted as substantive evidence. The same is true of the trial court's decision not to allow the jury to review Palasz' handwritten statement, as it was not admitted into evidence. Furthermore, the court acted within its sound discretion in denying the jury's request to examine the entire transcript of the trial proceedings. See *People v. Blalock*, 239 Ill. App. 3d 830, 841-43, 607 N.E.2d 645, 653 (1993); *People v. Creque*, 214 Ill. App. 3d 587, 596-97, 573 N.E.2d 1297, 1303-04 (1991). Despite defendant's concern that providing the jury with a redacted version of Palasz' testimony overemphasized statements that were unfavorable to defendant, we note that the trial court was not obligated to balance its ruling by providing evidence not admitted. As this court decided in *People v. Lee*, 243 Ill. App. 3d 1038, 614 N.E.2d 108 (1993), a trial court does not abuse its discretion by allowing jurors to review a witness' prior inconsistent statements admitted as substantive evidence while refusing to furnish them a copy of the witness' contradicted in-court testimony. Therefore, we hold that the trial court committed no abuse of discretion in its rulings with respect to the jury's requests for transcripts.

Next, defendant contends that his attorneys provided ineffective assistance of counsel by failing to request that their copy of Palasz' trial testimony be sent to the jury in response to its requests, by failing to preserve for the record the court's erroneous response to the jury's request for transcripts, and by failing to offer Palasz' handwritten statement as substantive evidence pursuant to section 115—10.1 (725 ILCS 5/115—10.1 (West 1992)).

■ ■ In order to establish that one was denied effective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that there

is a reasonable probability that, "were it not for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Whitehead,* 169 Ill. 2d 355, 380 (1996), citing *People v. Albanese,* 104 Ill. 2d 504, 525 (1984). In emphasizing defendant's duty to show prejudice, Illinois courts have noted that the standard for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the operation of the adversarial process that the trial cannot be relied upon as having achieved justice. *Albanese,* 104 Ill. 2d at 525, quoting *Strickland v. Washington,* 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064 (1984). Defendant argues that the facts alleged satisfy the aforementioned tests for a claim of ineffective assistance of counsel. We disagree.

First, there is no evidence that defense counsel actually had in his possession available copies of the entire trial transcript as alleged by defendant. Defendant argues that his postsentencing motion, which stated that such transcripts were "currently available," proves that defense counsel could have satisfied the jury's requests. However, the fact that a copy of trial testimony may have been available after sentencing does not show that it was available at the time the jury requested such transcripts.

Also, even if the defense was able to provide the transcripts, we are not persuaded that this would have changed the trial court's decision to deny the jury access to all but Palasz' redacted grand jury testimony. The trial court's reasoning behind its denials was not limited to its observation that the court lacked a copy of the trial transcripts. On the contrary, the court cited a number of factors as the basis for its denials, including its desire that the jurors rely upon their own recollections of the evidence and trial testimony during deliberations.

Additionally, we agree with the State that defense counsel's decision to forego requesting that Palasz' trial testimony be furnished to the jury was justifiable as an exercise of trial strategy. Simply put, much of Palasz' testimony was damaging to defendant, as it corroborated a great deal of Lenarczak's incriminating testimony. Although defendant may question the strategic value of electing not to offer the defense's copy of Palasz' trial testimony, we hold that defense counsel's inaction in this regard fell within the wide spectrum of defense tactics that Illinois courts have long considered to be an improper basis for supporting a claim of ineffective assistance of counsel. *People v. Guest,* 166 Ill. 2d 381, 394 (1995); *Flores,* 128 Ill. 2d at 106; *People v. Hillenbrand,* 121 Ill. 2d 537, 548 (1988) ("[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent"); *People v. Madej,*

106 Ill. 2d 201, 214 (1985). Therefore, we conclude that it cannot be said that defense counsel's representation fell below an objective standard of reasonableness and that the result of the trial proceedings would have been any different had they offered to furnish copies of the transcripts to the jury.

Moreover, we find no merit to defendant's claim of ineffectiveness based on his attorneys' failure to offer Palasz' handwritten statement as substantive evidence. Defendant asserts that Palasz' handwritten statement, which contained no mention of defendant's desire to kill Fawcett, was inconsistent with an oral statement attributed to Palasz by a detective who testified that Palasz had told him about defendant's desire to kill Fawcett. We note, however, that "inconsistency" for purposes of section 115—10.1 refers to the contradiction of a witness' prior statements with that witness' own in-court testimony. 725 ILCS 5/115—10.1 (West 1992). Here, Palasz' testimony at trial was that he did not hear defendant express a desire to kill Fawcett. This was consistent with Palasz' handwritten statement provided to a detective. The fact that the detective later contradicted Palasz' testimony by referring to Palasz' prior oral statement claiming that defendant did express a desire to kill Fawcett does not render Palasz' handwritten statement inconsistent under section 115—10.1. The reason is that it is the detective's testimony only that contradicts that of Palasz on the issue of defendant's intent; Palasz' handwritten statement and in-court testimony remain consistent. Since Palasz' handwritten statement, therefore, was inadmissible as substantive evidence under section 115—10.1, defendant's claim of ineffectiveness based thereon lacks merit.

Defendant also contends that three types of prejudicial prosecutorial misconduct deprived him of a fair trial. These include: (1) the use of defendant's aliases at trial and in closing argument; (2) the prosecution's reference during closing argument to defendant's refusal to reveal the location of the murder weapon to authorities; and (3) the prosecution's argument cautioning jurors not to look into defendant's eyes or touch him.

We believe that the trial court acted within its sound discretion in determining that evidence regarding defendant's liberal use of aliases was relevant to and probative of the issues of defendant's flight from Illinois authorities as well as his consciousness of guilt. With respect to the propriety of the State's closing arguments, we note that the prosecution is afforded considerable latitude and has the right to make uncharitable comments and draw unfavorable inferences based upon the evidence. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). Furthermore, a jury's verdict will not be disturbed absent a

showing that the prosecution's improper remarks resulted in substantial prejudice to the defendant and that, without those remarks, the verdict would have been different. *People v. Morgan*, 112 Ill. 2d 111, 132 (1986).

We disagree with defendant's contention that the prosecution erred because of references to defendant's aliases during the trial and argument, reference to defendant's refusal to reveal the location of the murder weapon during argument, and cautioning jurors during closing argument not to look into defendant's eyes or touch him. In particular, we are not convinced after a review of the entire record that the prosecution's closing arguments, taken as a whole, substantially prejudiced defendant.

█ Lastly, defendant argues that his life sentence is both excessive and unfairly disparate to the acquittal of his codefendant. The standard of review as to the issue of an excessive sentence is whether the trial court abused its discretion. *People v. Cox*, 82 Ill. 2d 268, 275 (1980), citing *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Additionally, we recognize that the trial court is in the best position to determine the appropriate punishment, and its decision is entitled to great weight and deference. *Perruquet*, 68 Ill. 2d at 154. The general rule as to the question of whether defendant's sentence was unfairly disparate is that arbitrary and unreasonable disparities between the sentences of similarly situated codefendants are prohibited. *People v. Jackson*, 145 Ill. 2d 43, 119 (1991); *People v. Ashford*, 121 Ill. 2d 55, 88 (1988). We note, however, that this general rule applies only to cases in which both defendants are found guilty.

In the present case, only defendant was found guilty. Faraci's acquittal, therefore, effectively precludes defendant from invoking the rule against unreasonably disparate sentencing. We do not find adequate grounds for reducing defendant's sentence. Based upon the evidence at trial, which, in our opinion, amply supports defendant's conviction of first-degree murder under the theory of accountability, we conclude that the trial court did not abuse its discretion in sentencing defendant to life imprisonment.

Accordingly, the decision of the trial court is affirmed.

Affirmed.

McNULTY, P.J., and RAKOWSKI, J., concur.